19 F.3d 30
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
UNITED STATES of America, Plaintiff-Appellee,
v.
Jose Noel GARCIA, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Luis Alberto GARIBALDI-GOMEZ, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Geraldo PRIETO-MARTINEZ, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Fernando ALCAREZ-OCHOA, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Benito RUBIO-GARCIA, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Israel AGUILAR-PACHECO, Defendant-Appellant.
 Nos. 92-10494, 92-10607, 92-10661, 92-10664, 92-10665 and 92-10667.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Nov. 1, 1993.
Decided Feb. 15, 1994.
 
 Before: ALARCON, LEAVY and KLEINFELD, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 
 2
 Appellants raise several joint and individual claims in this appeal from their convictions after a jury trial for conspiracy to distribute 500 kilograms of cocaine and possession of 100 kilograms of cocaine with the intent to distribute it. Israel Aguilar-Pacheco (Aguilar-Pacheco) and Geraldo Prieto-Martinez (Prieto-Martinez) appeal from the district court's denial of their motions for judgments of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure; Aguilar-Pacheco, Prieto-Martinez, and Benito Rubio-Garcia (Rubio-Garcia) appeal from the district court's denial of their request for a multiple conspiracy jury instruction; Luis Alberto Garibaldi-Gomez (Garibaldi-Gomez), Aguilar-Pacheco, Rubio-Garcia, Prieto-Martinez, and Fernando Alcarez-Ochoa (Alcarez-Ochoa) appeal from the sentences imposed by the district court.
 
 
 3
 In addition, appellants individually raise several claims which are discussed in this disposition following the joint claims. Aguilar-Pacheco appeals from the district court's denial of his motion to suppress 60 kilograms of cocaine contained in the trunk of a car he was driving; Jose Noel Garcia (Jose Garcia) appeals from the district court's finding that the Government did not breach the terms of a plea agreement; Prieto-Martinez appeals from the district court's admission of testimony by Special Agent Tim Sellers of the Drug Enforcement Administration (DEA) concerning drug negotiations which occurred on May 30, 1991, pursuant to Rule 404(b) of the Federal Rules of Evidence; Prieto-Martinez further appeals from the district court's ruling permitting the Government to cross-examine him regarding the May 30 negotiations.
 
 
 4
 We affirm because we find no merit to any of appellants' contentions. In an opinion for publication also filed today, we address the contention raised by Rubio-Garcia and Alcarez-Ochoa that the district court erred by permitting Special Agent Sellers to testify concerning statements made by appellants in Spanish which were simultaneously translated by Jose Garcia.
 
 I. PERTINENT FACTS AND PROCEDURAL HISTORY
 
 5
 Jose Garcia, Rubio-Garcia, Prieto-Martinez, and Alcarez-Ochoa entered into an arrangement to sell 500 kilograms of cocaine to Special Agent Sellers. On June 17, 1991, the parties had extensive discussions concerning this transaction in a hotel room in Tucson, Arizona. As directed by the conspirators, Special Agent Sellers and Special Agent Michael Carver went to a residence located in Tucson to obtain delivery of the cocaine. At that location, they were shown 40 one kilogram bricks of cocaine. Moments later, Jose Garcia, Garibaldi-Gomez, and Alcarez-Ochoa were arrested at the house.
 
 
 6
 Special Agent Sellers and Special Agent Carver then proceeded to the hotel where they arrested Rubio-Garcia in his room. While driving back to the residence, Special Agent Carver was notified by Special Agent Rheingans that Jose Garcia told him that a white Thunderbird would be arriving at the house with an Hispanic driver. After returning to the residence, Special Agent Carver observed a white Thunderbird being driven by an Hispanic male. Aguilar-Pacheco, the driver, was arrested, and a search of the trunk revealed that the car contained 60 one kilogram bricks of cocaine.
 
 
 7
 We discuss each issue and any additional facts pertinent thereto in separate sections of this memorandum.
 
 
 8
 II. AGUILAR-PACHECO'S AND PRIETO-MARTINEZ'S MOTIONS PURSUANT
 
 
 9
 TO FEDERAL RULE OF CRIMINAL PROCEDURE 29 FOR
 
 JUDGMENTS OF ACQUITTAL
 
 10
 Aguilar-Pacheco and Prieto-Martinez contend that the district court erred by failing to grant judgments of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure. On appeal, we will sustain a conviction if "reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." United States v. Bishop, 959 F.2d 820, 829 (9th Cir.1992) (internal quotation and citation omitted).
 
 A. Aguilar-Pacheco
 
 11
 At the conclusion of both the Government's case-in-chief and the defense case, Aguilar-Pacheco moved for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29. The district court denied the motion. We reject Aguilar-Pacheco's contention that the evidence is insufficient.
 
 1. Conspiracy
 
 12
 In order to sustain a conviction on count one for conspiracy, the Government must establish "(1) an agreement to accomplish an illegal objective; (2) coupled with one or more acts in furtherance of the illegal purpose; and (3) the requisite intent necessary to commit the underlying substantive offense." United States v. Rubio-Villareal, 927 F.2d 1495, 1499 (9th Cir.1991), vacated in part, 967 F.2d 294 (9th Cir.1992) (en banc). The record contains ample evidence to demonstrate the existence of a conspiracy: (1) Special Agent Sellers entered into an agreement with Jose Garcia, Prieto-Martinez, Alcarez-Ochoa, Garibaldi-Gomez, and Rubio-Garcia for the purchase of 500 kilograms of cocaine; (2) the co-conspirators traveled and made interstate phone calls in furtherance of the agreement; and (3) the co-conspirators expressed their intent to commit the offense through numerous statements.
 
 
 13
 Since the Government established the existence of a conspiracy, we are required to sustain Aguilar-Pacheco's conviction as long as the record demonstrates that he had at least a slight connection to the conspiracy. See United States v. Ocampo, 937 F.2d 485, 489 (9th Cir.1991). The following facts are sufficient to link Aguilar-Pacheco to the conspiracy: (1) Aguilar-Pacheco was arrested while driving the Thunderbird which contained 60 kilograms of cocaine to the residence; (2) the Thunderbird driven by Aguilar-Pacheco arrived at the residence at the approximate time that the delivery was to occur; and (3) Aguilar-Pacheco drove slowly as he proceeded towards the house and did not pull into the driveway.
 
 
 14
 Aguilar-Pacheco's reliance on Rubio-Villareal, United States v. Penagos, 823 F.2d 346 (9th Cir.1987) and United States v. Lopez, 625 F.2d 889 (9th Cir.1980) is misplaced. These cases are factually distinguishable. In Rubio-Villareal, the defendant's behavior at the San Ysidro Port of Entry while driving from Mexico to the United States in a pickup truck aroused the suspicion of a Customs Inspector. Rubio-Villareal, 927 F.2d at 1498. A different inspector subsequently broke into a false compartment inside the truck which contained cocaine. Id. The defendant later left the truck at a parking lot, where it was towed away. Id. Approximately one month later, Rubio-Villareal went to retrieve the truck. Id. He was arrested and charged with two counts of conspiracy to import cocaine and two counts of possession of cocaine. Id. at 1497. We reversed because we concluded that the Government failed to establish the existence of an agreement to accomplish an illegal objective. Id. at 1499-1500. Unlike Rubio-Villareal, in this case, the Government successfully established the existence of a conspiracy and proved that Aguilar-Pacheco delivered cocaine to the residence where the drug deal was to occur.
 
 
 15
 In Penagos, the defendant was indicted on drug conspiracy charges because he was acting as a "lookout" while cocaine was loaded into a car. Penagos, 823 F.2d at 348. We held that there was insufficient evidence to connect the defendant to the acts of his alleged co-conspirators. Id. at 349. We reasoned that the defendant's "behavior was perfectly consistent with that of an innocent person having no stake or interest in drug transactions." Id. By contrast, Aguilar-Pacheco was more than a mere "lookout." He was responsible for delivering the narcotics to the residence.
 
 
 16
 Aguilar-Pacheco also directs our attention to the decision of this court in United States v. Lopez, 625 F.2d 889 (9th Cir.1990) in support of his argument. In Lopez, we reversed a drug conspiracy conviction because the Government was unable to demonstrate that Lopez acted in furtherance of the conspiracy or was involved in the negotiations or in the delivery of narcotics. Id. at 896. The record demonstrated that Lopez was a passenger in a car with two major drug conspirators. Lopez did not discuss narcotics transactions. He had no financial interest in heroin transactions. He was not related to any of the drug conspirators. Two statements he made subsequent to his arrest were ambiguous and did not establish his role as a conspirator. Id. at 896-97. In the matter sub judice, the record shows that Aguilar-Pacheco was an active participant in the conspiracy, which distinguishes his conduct from that of the appellant in Lopez.
 
 2. Possession of Cocaine
 
 17
 In order to sustain a conviction for possession of cocaine, the Government must establish that the accused knowingly possessed cocaine with the intent to distribute it. United States v. Ocampo, 937 F.2d 485, 488 (9th Cir.1991). Possession of a large amount of cocaine may be sufficient to infer both knowledge and intent.[1] Id. The Government may prove possession through circumstantial evidence such as proof of exclusive dominion over the item. Id. at 489. However, the Government may not establish possession merely on the basis of defendant's physical proximity to the drugs or his presence on the property where drugs are located. Id.
 
 
 18
 Aguilar-Pacheco cites our decision in United States v. Rubio-Villareal, 967 F.2d 294 (9th Cir.1992) (en banc) for the proposition that the district court incorrectly ruled that the jury could infer knowledge merely because he drove the car containing cocaine. We reject Aguilar-Pacheco's argument because it reflects a misreading of Rubio-Villareal.
 
 
 19
 At issue in the en banc decision in Rubio-Villareal was the following jury instruction:
 
 
 20
 You are instructed that if you find that the defendant was the driver of a vehicle containing contraband in this case; and if you find that the cocaine was found inside that vehicle and concealed in its body, you may infer from these two facts, that the defendant knew that the cocaine was in the automobile; however, you are never required to make this inference. It is the exclusive province of the jury to determine whether the facts and circumstances shown by the evidence in this case warrants any inference which the law permits the jury to draw.
 
 
 21
 Id. at 295. We held that the instruction was defective for two reasons. First, the instruction intruded upon the jury's deliberations by informing it that the judge believed sufficient evidence existed to support a conviction. Id. at 299. Second, the instruction allowed the jury to convict the defendant on the possession charge without considering all of the evidence because it focused the jury on two isolated facts. Id.
 
 
 22
 Unlike the circumstances in Rubio-Villareal, in this matter the district court did not give a similar jury instruction. Rather, the judge instructed as follows:
 
 
 23
 In order for a defendant to be found guilty of that [possession] charge, the Government must prove as to that defendant each of the following elements beyond a reasonable doubt:
 
 
 24
 First, the defendant knowingly possessed cocaine; and
 
 
 25
 second, the defendant possessed it with the intent to deliver it to another person.
 
 
 26
 ....
 
 
 27
 The Government must prove beyond a reasonable doubt that although defendant Aguilar-Pacheco was driving the 1983 Ford Thunderbird on June 18, 1991, he had knowledge of the contraband contained in the trunk of that vehicle.
 
 
 28
 A person has possession of something if the person knows of its presence and has physical control of it ... [or] has the power and intention to control it.
 
 
 29
 ....
 
 
 30
 An act is done knowingly if the defendant is aware of the act and does not act or fail to act through ignorance, mistake or accident.... You may consider the evidence of the defendant's words, acts or omissions, along with all the other evidence, in deciding whether the defendant acted knowingly.
 
 
 31
 RT June 11, 1992 at 107-10.
 
 
 32
 Aguilar-Pacheco also relies on United States v. Chambers, 918 F.2d 1455 (9th Cir.1990), and United States v. Weaver, 594 F.2d 1272 (9th Cir.1979) in support of his contention that the evidence is insufficient to support his conviction for possession of cocaine with the intent to distribute it. In Chambers, the defendant was observed driving a van recklessly. The police pursued him. Chambers, 918 F.2d at 1457. In his flight to avoid arrest, Chambers ignored traffic regulations. Id. at 1458. We held in Chambers that the defendant's attempt to flee was probative both as to possession and knowledge in a prosecution for possession of cocaine with the intent to distribute it. Id. We also ruled that to prove the element of possession, the Government may rely upon "circumstantial evidence that the defendant had the power to dispose of the drug." Id. at 1457 (quoting United States v. Disla, 805 F.2d 1340, 1350 (9th Cir.1986)). Here, the Government proved possession by introducing evidence that Aguilar-Pacheco was the driver and sole occupant of the white Thunderbird, and had the power to dispose of the cocaine.
 
 
 33
 Our decision in Weaver is not helpful to Aguilar-Pacheco. In Weaver, we held that since there was no evidence that the defendant possessed or touched the package, the Government failed to establish the requisite dominion and control. Weaver, 594 F.2d at 1274-75. Unlike the circumstances in Weaver, in this matter, Aguilar-Pacheco had sole possession of the cocaine as he was driving to the residence.
 
 B. Prieto-Martinez
 
 34
 At the conclusion of the Government's case-in-chief and the presentation of his case, Prieto-Martinez moved for a judgment of acquittal as to both counts in the indictment pursuant to Federal Rule of Criminal Procedure 29. The district court denied each motion.
 
 1. Conspiracy
 
 35
 Citing United States v. Melchor-Lopez, 627 F.2d 886, 891 (9th Cir.1980), Prieto-Martinez contends that the conspiracy conviction must be reversed because the evidence shows mere association. We disagree.
 
 
 36
 The record shows that Prieto-Martinez met Sellers in the lobby of the Pueblo Inn on June 17 and subsequently took him to room 150 to meet several of the other co-conspirators. While Sellers was discussing the deal in the hotel room with Alcarez-Ochoa, a dispute arose between the parties, at which time Prieto-Martinez told everyone to remain calm. Additionally, Prieto-Martinez assured Sellers that the individuals with whom he was dealing would deliver the cocaine because they were dependable businessmen. This evidence clearly demonstrates that Prieto-Martinez had the requisite slight connection to sustain his conspiracy conviction.
 
 2. Possession of Cocaine
 
 37
 The Government argues that Prieto-Martinez's conviction for possession of cocaine is supported under a theory of aiding and abetting. See United States v. Sanchez-Mata, 925 F.2d 1166, 1168 (9th Cir.1991) (conviction for possession with the intent to distribute narcotics may be based upon a theory of co-conspirator liability or aiding and abetting or exercising dominion and control over the narcotics). In order to sustain a conviction as an aider and abetter, the Government must prove: (1) the defendant had the specific intent to facilitate the commission of a crime by another; (2) the defendant had the requisite intent of the underlying substantive offense; (3) the defendant assisted or participated in the commission of the underlying substantive offense; and (4) someone committed the underlying substantive offense. United States v. Gaskins, 849 F.2d 454, 459 (9th Cir.1988). Participation is established if a defendant counsels or induces another to commit a crime. United States v. McKoy, 771 F.2d 1207, 1216 (9th Cir.1985).
 
 
 38
 As discussed above, the evidence shows that Prieto-Martinez took Special Agent Sellers to the hotel room to discuss the transaction with several of the co-conspirators, he acted as a mediator telling the parties to remain calm when a dispute arose, and he told Special Agent Sellers that he was dealing with dependable businessmen who would deliver the cocaine. These facts are also sufficient to support Prieto-Martinez's conviction as an aider and abetter.
 
 III. MULTIPLE CONSPIRACY INSTRUCTION
 
 39
 Rubio-Garcia, Prieto-Martinez, and Aguilar-Pacheco contend that the district court erred by failing to give a multiple conspiracy jury instruction because the Government (1) introduced evidence of the May 30, 1991, negotiations and (2) admitted that the conspiracy probably began on June 13 or 14, 1991. As a consequence, Rubio-Garcia, Prieto-Martinez, and Aguilar-Pacheco contend that there was a variance between the indictment and the evidence introduced at trial. We review de novo whether the evidence was sufficient to support a multiple conspiracy instruction. United States v. Anguiano, 873 F.2d 1314, 1317 (9th Cir.), cert. denied, 493 U.S. 969 (1989).
 
 
 40
 We distinguish between single and multiple conspiracies based upon "whether there was one overall agreement to perform various functions to achieve the objectives of the conspiracy." United States v. Smith, 790 F.2d 789, 795 (9th Cir.1986) (internal quotation and citation omitted). In this matter, Rubio-Garcia, Prieto-Martinez, and Aguilar-Pacheco have confused "separate acts at separate times with separate conspiracies." Id. (internal quotation and citation omitted); see also United States v. Tille, 729 F.2d 615, 621 (9th Cir.) (single conspiracy may also include subagreements among conspirators), cert. denied, 469 U.S. 845 (1984).
 
 
 41
 A. Evidence Regarding the May 30, 1991, Negotiations
 
 
 42
 Special Agent Sellers testified regarding discussions which occurred on May 30, 1991, involving Jose Garcia and Prieto-Martinez in a failed attempt to consummate a 15 kilogram cocaine deal. According to Rubio-Garcia, Prieto-Martinez, and Aguilar-Pacheco, the introduction of this testimony required the district court to give a multiple conspiracy jury instruction. In support of their argument, appellants cite Kotteakos v. United States, 328 U.S. 750 (1946) for the proposition that whether or not a variance exists between the indictment and actual proof presented at trial is a jury question, and United States v. Linn, 880 F.2d 209, 217 (9th Cir.1989) for the proposition that an instruction regarding the existence of a multiple conspiracy is warranted if the theory is "supported by law and has some foundation in the evidence." Id. at 743 (quoting United States v. Echeverry, 759 F.2d 1451, 1455 (9th Cir.1985)).
 
 
 43
 In Kotteakos, the Government indicted 32 individuals for conspiring to violate the National Housing Act. Kotteakos, 328 U.S. at 752. The evidence introduced at trial demonstrated the existence of at least eight different conspiracies. The indictment charged all 32 defendants in a single conspiracy. Id. The Supreme Court reversed, holding that it was highly probable that the variance between the indictment and actual proof at trial was substantial. Id. at 776.
 
 
 44
 We have held that multiple conspiracy instructions are necessary when an indictment charges that several defendants committed one conspiracy but the evidence established that some of the defendants were involved solely in separate conspiracies which were unrelated to the charged conspiracy. United States v. Anguiano, 873 F.2d 1314, 1317 (9th Cir.), cert. denied, 493 U.S. 969 (1989). Under such circumstances, an instruction is necessary to avoid a prejudicial variance between the evidence at trial and the indictment. Id.
 
 
 45
 Unlike the defendants in Kotteakos, Rubio-Garcia, Prieto-Martinez, and Aguilar-Pacheco are unable to demonstrate the existence of a prejudicial variance. A prejudicial variance results if a "spillover" of guilt might occur whereby a defendant who was only involved in a minor conspiracy is associated with and convicted of a larger conspiracy in which he was not a participant. Anguiano, 873 F.2d at 1317-18. Therefore, in order to obtain the desired instruction, Rubio-Garcia, Prieto-Martinez, and Aguilar-Pacheco must demonstrate that they were convicted of the charged offenses because of the introduction of evidence regarding the May 30 negotiations. A review of the record indicates that Rubio-Garcia, Prieto-Martinez, and Aguilar-Pacheco are unable to satisfy this burden as there is sufficient evidence to sustain their convictions for the offenses charged in the indictment.[2]
 
 B. Starting Date of Conspiracy
 
 46
 The indictment alleges that the conspiracy began on or about May 27, 1991. Rubio-Garcia, Prieto-Martinez, and Aguilar-Pacheco maintain the Government admitted that the conspiracy probably began on June 13 or 14, 1991, resulting in a variance between the evidence introduced at trial and the starting date contained within the indictment. Rubio-Garcia, Prieto-Martinez, and Aguilar-Pacheco present no evidence to suggest that this fact, by itself, in any way prejudiced their case. Additionally, the mere fact that the district court gave an "on or about" jury instruction in this matter does not require a multiple conspiracy instruction. See United States v. Harrison-Philpot, 978 F.2d 1520, 1525-26 (9th Cir.1992) (indictment which indicates that alleged illegal conduct occurred within an identifiable time frame identifies the relevant dates of the conspiracy with sufficiently specificity), cert. denied, 113 S.Ct. 2392 (1993); United States v. McCown, 711 F.2d 1441, 1450 (9th Cir.1983) (indictment stating that conspiracy began "on or about" and ended "on or about" certain dates is sufficient to apprise defendant of charges).
 
 
 47
 It is also possible to interpret Rubio-Garcia's, Prieto-Martinez's, and Aguilar-Pacheco's contention as suggesting that they were prejudiced because the May 30, 1991, negotiations occurred prior to June 13 or 14, 1991. However, since the May 30 testimony did not establish a prejudicial "spillover," the mere fact that the Government informed the court that the conspiracy probably began on June 13 or 14, as opposed to May 27, similarly fails to establish a prejudicial "spillover."
 
 IV. SENTENCING ERRORS
 
 48
 Garibaldi-Gomez, Aguilar-Pacheco, Rubio-Garcia, Prieto-Martinez, and Alcarez-Ochoa all contend that the district court committed various sentencing errors. We review the district court's interpretation of the Sentencing Guidelines de novo, United States v. Blaize, 959 F.2d 850, 851 (9th Cir.), cert. denied, 112 S.Ct. 2954 (1992), and the district court's factual findings at sentencing for clear error, United States v. Chapnick, 963 F.2d 224, 226 (9th Cir.1992). We review departures from the Sentencing Guidelines under the three part test of United States v. Lira-Barraza, 941 F.2d 745 (9th Cir.1991) (en banc). First, a reviewing court must determine if a trial court had the legal authority to depart. Second, the court reviews for clear error factual findings in support of a departure. Third, the court must determine whether the extent of the departure from the guideline range was unreasonable. Id. at 746-47.
 
 A. Garibaldi-Gomez
 
 49
 Garibaldi-Gomez raises three issues with regard to sentencing: (1) the district court should have conducted a hearing to determine if the Government was required to make a motion pursuant to United States Sentencing Guidelines Sec. 5K1.1 (hereinafter referred to as "U.S.S.G."); (2) the district court should have conducted a hearing to determine if the "free-talk" or Kastigar[3] agreements between Garibaldi-Gomez and the Government constitute per se bad faith adhesion contracts; and (3) defense counsel rendered ineffective assistance at the sentencing hearing. We reject all three arguments.
 
 
 50
 1. The Government Was Not Obligated to File a Section 5K1.1 Motion
 
 
 51
 Garibaldi-Gomez was debriefed by the Government pursuant to a proposal whereby he would provide "off-the-record" information in exchange for possible consideration at sentencing by the Government. Garibaldi-Gomez contends that the Kastigar agreement required the Government to make a downward departure sentencing motion pursuant to U.S.S.G. Sec. 5K1.1. Section 5K1.1 of the Sentencing Guidelines provides as follows: "Upon motion of the government stating that the defendant has provided substantial assistance in the investigation or prosecution of another person who has committed an offense, the court may depart from the guidelines."
 
 
 52
 The Government correctly argues that because Garibaldi-Gomez failed to raise this issue before the district court we will not review it for the first time on appeal. See United States v. Flores-Payon, 942 F.2d 556, 558 (9th Cir.1991).[4] We decline to address the merits of Garibaldi-Gomez's contention because none of the exceptions to this rule are applicable here.
 
 
 53
 2. Whether the Kastigar Letters Constitute Bad Faith Adhesion Contracts
 
 
 54
 A review of the record supports the Government's argument that appellant failed to raise this issue before the district court. Therefore, we decline to decide whether the Kastigar agreements should be construed as bad faith adhesion contracts.
 
 
 55
 3. Garibaldi-Gomez's Lawyer Did Not Render Ineffective Assistance of Counsel At Sentencing
 
 
 56
 Garibaldi-Gomez maintains that his counsel was ineffective at sentencing because he admitted that there was insufficient evidence to warrant a section 5K1.1 motion for the Government. Generally, appellate courts will not review an ineffectiveness claim on direct appeal. United States v. Laughlin, 933 F.2d 786, 788 (9th Cir.1991). However, in this matter, Garibaldi-Gomez's argument pertains solely to counsel's performance at the sentencing hearing, and therefore the record is sufficient to address his claim. See United States v. Swanson, 943 F.2d 1070, 1072 (9th Cir.1991) (ineffectiveness claim based on statements at closing argument provides sufficient record to evaluate claim on direct review).
 
 
 57
 A sentencing hearing is considered a critical stage in a criminal proceeding, thereby invoking a defendant's Sixth Amendment right to counsel. Mempa v. Rhay, 389 U.S. 128, 134, 137 (1967). Consequently, Garibaldi-Gomez's ineffective assistance of counsel claim must be analyzed under the two-prong test announced in Strickland v. Washington, 466 U.S. 668 (1984).[5] Under this standard, a defendant must establish both that his lawyer's performance was deficient and that the deficient performance resulted in prejudice. Strickland, 466 U.S. at 687. We conclude that Garibaldi-Gomez is unable to satisfy either test.
 
 
 58
 At sentencing, defense counsel candidly told the court that Garibaldi-Gomez was not eligible for a section 5K1.1 departure. However, counsel argued that the court should consider the following factors in imposing sentence: duress, aberrant behavior, cooperation with the Government, and personal background information. In light of Garibaldi-Gomez's inability to receive a section 5K1.1 departure because no motion was made by the prosecutor, counsel's decision to focus on these other factors was not unreasonable under the circumstances. See Id. at 688.
 
 B. Aguilar-Pacheco
 
 59
 At sentencing, counsel for Aguilar-Pacheco argued for a downward adjustment as a minimal participant under U.S.S.G. Sec. 3B1.2, citing United States v. Petti, 973 F.2d 1441 (9th Cir.1992), cert. denied, 113 S.Ct. 1859 (1993), as well as a downward departure pursuant to U.S.S.G. Sec. 5K2.0, citing United States v. Valdez-Gonzalez, 957 F.2d 643 (9th Cir.1992), and United States v. Fairless, 975 F.2d 664 (9th Cir.1992).
 
 
 60
 1. A Relative Culpability Finding is Not Required to Evaluate Aguilar-Pacheco's Status as a Minimal Participant
 
 
 61
 The district court granted Aguilar-Pacheco a two-level sentencing adjustment pursuant to U.S.S.G. Sec. 3B1.2 as a minor participant. Aguilar-Pacheco directs our attention to United States v. Petti, 973 F.2d 1441 (9th Cir.1992), cert. denied, 113 S.Ct. 1859 (1993) to support his contention that the district court was required to compare his culpability to that of his co-conspirators to determine if he was entitled to a four level adjustment as a minimal participant.[6] In response, the Government argues that a district court is not required to make a culpability comparison to determine if a defendant is entitled to a minor participant adjustment, citing United States v. Andrus, 925 F.2d 335, 338 (9th Cir.), cert. denied, 112 S.Ct. 249 (1991), and United States v. Rexford, 903 F.2d 1280, 1282 (9th Cir.1990).
 
 
 62
 In Petti, the Government argued that the district court erred in granting a four-level adjustment based upon the nature and extent of the defendant's conduct as compared with that of his co-defendants. Petti, 973 F.2d at 1446-47. We held that "in determining whether a downward departure from the sentencing range is warranted, the relevant comparison in determining whether a four-level adjustment in offense level is appropriate is to the conduct of co-participants in the case at hand." Id. at 1447.
 
 
 63
 In this matter, the record demonstrates that counsel for Aguilar-Pacheco failed to cite our decision in Petti to the district court and failed to articulate clearly to the court that it was required to make a relative culpability determination. Instead, counsel for Aguilar-Pacheco made a general statement that Aguilar-Pacheco should be considered a minor or minimal participant. Aguilar-Pacheco did not object to the failure of the court to make an express finding that it compare his conduct to that of his co-participants. Without such an objection, the court was denied the opportunity to make an express finding or to indicate that such a finding was implicit in the comments it had made. Because Aguilar-Pacheco did not raise the Petti issue before the district court, we decline to do so for the first time on appeal. See United States v. Flores-Payon, 942 F.2d 556, 558 (9th Cir.1991) (issues not presented before the district court cannot generally be raised for the first time on appeal).
 
 
 64
 2. Valdez-Gonzalez Does Not Provide a Basis for a Downward Departure
 
 
 65
 Aguilar-Pacheco contends that he is entitled to a downward departure pursuant to United States v. Valdez-Gonzalez, 957 F.2d 643 (9th Cir.1992). In Valdez-Gonzalez, the defendant was not eligible for a downward adjustment under U.S.S.G. Sec. 3B1.2. Id. at 648. We held that because the record showed that the defendant acted as a "mere mule[s] in the drug trade," he was a marginal participant. Id. at 647. We also determined that this factor, combined with the unavailability of a section 3B1.2 adjustment, could provide an appropriate basis for a downward departure pursuant to section 5K2.0. Id.
 
 
 66
 In this matter, the district court found as follows:
 
 
 67
 First, I find that the Valdez case doesn't have application here. It requires both a marginal role and the unavailability of a 3B1.2 downward adjustment. I have adjusted downward and find no basis in law to depart downward further pursuant to Valdez. However, even if there is a basis and I somehow misread Valdez, I would not depart downward further, or I wouldn't depart downward from the range that I have found in this case.
 
 
 68
 RT Oct. 19, 1992 at 55. Aguilar-Pacheco argues that the district court misinterpreted the law concerning the availability of a downward adjustment pursuant to Valdez-Gonzalez. We reject his argument.
 
 
 69
 The Government correctly notes that a district court's refusal to depart under the Sentencing Guidelines is not reviewable by an appellate court. See United States v. Robinson, 958 F.2d 268, 272 (1992); United States v. Morales, 898 F.2d 99, 101-02 (9th Cir.1990). Here, the district court indicated that it would refuse to make a further downward departure even if it misread Valdez-Gonzalez. Under the Sentencing Guidelines, an appellate court can conduct a de novo review of the trial court's decision not to depart if the district court refuses to depart because it believes it lacks legal authority to act. United States v. Mejia, 953 F.2d 461, 464 (9th Cir.1991), cert. denied, 112 S.Ct. 1983 (1992). In this matter, the district court indicated that it would not depart any further even if there was a legal basis to depart. See United States v. Williams, 898 F.2d 1400, 1403 (9th Cir.1990) (appellate court lacks jurisdiction to review discretionary refusal to depart from Sentencing Guidelines); cf. United States v. Belden, 957 F.2d 671, 676 (9th Cir.) (appellate court will conduct de novo review of district court's legal decision that Sentencing Guidelines prevent downward departure if court indicates that it would otherwise have departed), cert. denied, 113 S.Ct. 234 (1992). Accordingly, a remand would not result in a change in the sentence previously imposed.
 
 
 70
 3. Aguilar-Pacheco is Not Entitled to a Determination as to Whether he Committed an Act of Aberrant Behavior
 
 
 71
 At sentencing, Aguilar-Pacheco also argued that he was entitled to a downward departure because his involvement in this matter represented an act of "aberrant behavior" pursuant to our decision in United States v. Fairless, 975 F.2d 664 (9th Cir.1992). In Fairless, we held that a district court could make a downward departure under U.S.S.G. Sec. 5K2.0, if the court found that under the totality of circumstances, a defendant's conduct was an act of aberrant behavior. Id. at 669. The district court based its decision upon the following "convergence of factors":
 
 
 72
 (1) the robbery was Fairless's first criminal offense, (2) Fairless suffered from manic depression, (3) the fact that he committed the robbery with an unloaded gun indicated that Fairless was suicidal, (4) Fairless was under extreme pressure from a combination of circumstances, including the fact that he had recently lost his job, and (5) the court had received numerous letters from Fairless's family and friends stating that the robbery was a "complete shock" and out of character.
 
 
 73
 Id. at 668.
 
 
 74
 An examination of the sentencing record indicates that Aguilar-Pacheco failed to lay an evidentiary foundation to support his aberrant behavior claim. At sentencing, counsel for Aguilar-Pacheco made the following argument:
 
 
 75
 And that's why I've cited Valdez and Fairless, because I think those courts were struggling with that. What do you do with somebody who makes a very serious mistake for the first time in his life, who has no idea of the enormous consequences of making that mistake, no conceivable idea that it could be--he could be standing here today facing 24 years? But what do you do with that individual, in all fairness to the other individuals who are about to be sentenced, and sentence him consistently?
 
 
 76
 Defense counsel did not identify specific factors concerning Aguilar-Pacheco's background or role in the offense which would have provided the district court with a factual basis to evaluate Aguilar-Pacheco's aberrant behavior claim. See United States v. Anders, 956 F.2d 907, 911 (9th Cir.1992) (burden of proof is on defendant to prove appropriateness of a downward departure), cert. denied, 113 S.Ct. 1592 (1993). Additionally, when defense counsel cited Fairless in his motion for a downward departure, counsel stated that he did so on the basis of "the facts which are fully set forth in the Presentence Report and Defendant's previous motions." Our review of these documents demonstrates that they similarly fail to provide a sufficient evidentiary foundation which would justify an aberrant behavior departure.
 
 
 77
 Aguilar-Pacheco contends that because the district court did not make a separate ruling concerning his aberrant behavior claim, a remand is necessary to determine if the trial court believed it lacked authority to depart or whether it was not inclined to depart. Aguilar-Pacheco is incorrect. Prior to the sentencing hearing, Aguilar-Pacheco had provided the court with several theories to justify a downward departure, including the aberrant behavior claim. The court indicated that "even if there is a basis and I somehow misread Valdez, I would not depart further, or I wouldn't depart downward from the range that I have found in this case." Aguilar-Pacheco has failed to demonstrate that the court did not have in mind his Fairless claim when it ruled that it wouldn't depart further. Additionally, Aguilar-Pacheco did not request a specific finding regarding the aberrant behavior claim, nor did he request a clarification of the court's ruling. Therefore, we reject Aguilar-Pacheco's contention because he failed to provide an evidentiary basis which would justify his aberrant behavior theory, and because he failed to demonstrate why the district court's ruling was erroneous.
 
 C. Rubio-Garcia
 
 78
 Rubio-Garcia argues that the district court clearly erred in failing to find that he was a minor participant pursuant to U.S.S.G. Sec. 3B1.2. Additionally, he maintains that the district court erred in calculating the offense level on the basis of the negotiated quantity of 500 kilograms of cocaine.
 
 
 79
 1. A Relative Culpability Finding is Not Required to Determine if Rubio-Garcia was a Minor Participant
 
 
 80
 Rubio-Garcia cites United States v. Petti, 973 F.2d 1441 (9th Cir.1992), cert. denied, 113 S.Ct. 1859 (1993), for the proposition that the district court should compare the defendant's conduct to that of his co-conspirators at sentencing. His reliance on Petti is misplaced. In Petti, we held that it is appropriate for the district court to compare relative culpability when deciding if a four-level downward adjustment is warranted based on a defendant's status as a minimal participant. Id. at 1447. However, a district court is not required to make a relative culpability determination when a defendant is requesting a minor participant finding. United States v. Peters, 962 F.2d 1410, 1415 n. 1 (9th Cir.1992). Therefore, Rubio-Garcia's involvement in the conspiracy must be viewed without reference to his co-conspirators to determine if he is entitled to a minor participant adjustment.
 
 
 81
 The record indicates that Rubio-Garcia told Special Agent Sellers that he "was a partner and also had the responsibility for making the decisions in this drug deal." Furthermore, Special Agent Sellers testified that Rubio-Garcia said it would be "no problemo" to provide 500 kilograms of cocaine now and 500 kilograms every three to four days. The record establishes that the district court's finding that Rubio-Garcia was not eligible for a downward adjustment was not clearly erroneous.
 
 
 82
 2. Offense Level Calculation Properly Based Upon Negotiated Quantity of 500 Kilograms
 
 
 83
 Rubio-Garcia contends that the district court clearly erred in calculating his base level pursuant to the negotiated but not delivered quantity of 500 kilograms. Under the Sentencing Guidelines, the determination of the appropriate base offense level for a conspiracy is as follows: "If a defendant is convicted of a conspiracy or an attempt to commit any offense involving a controlled substance, the offense level shall be the same as if the object of the conspiracy or attempt has been completed." U.S.S.G. Sec. 2D1.4; see also United States v. Alvarez-Cardenas, 902 F.2d 734, 736 (9th Cir.1990) (it is clear that the offense level for a conspiracy is determined by the amount that was conspired to be sold and not the amount actually sold). Application Note 1 to Sec. 2D1.4 further clarifies the calculation procedure:
 
 
 84
 [w]here the court finds that the defendant did not intend to produce and was not reasonably capable of producing the negotiated amount, the court shall exclude from the guideline calculation the amount that it finds the defendant did not intend to produce and was not reasonably capable of producing.
 
 
 85
 The district court found that the appropriate amount was 500 kilograms, explaining that "[i]f somebody can produce 100 kilos it's not at all unreasonable that they can produce 500 kilos." RT Oct. 19, 1992 at 47. This finding is supported by the record.[7] We reject Rubio-Garcia's argument because there was no evidence presented by any appellant which demonstrated an inability to produce the 500 kilograms. See United States v. Barnes, 993 F.2d 680, 683-84 (9th Cir.1993) (defendant bears burden of establishing inability to produce the negotiated amount).
 
 D. Prieto-Martinez
 
 86
 Prieto-Martinez contends that the district court erred by not granting him a four-level downward adjustment as a minimal participant in the conspiracy. Additionally, Prieto-Martinez contends that the district court erred in calculating the base offense level at 40, representing 500 kilograms, instead of 36, representing the delivered quantity of 100 kilograms.
 
 
 87
 1. Prieto-Martinez is Not Entitled to a Downward Adjustment as a Minimal Participant
 
 
 88
 Prieto-Martinez supports his minimal participant argument by stating that "it is clear that his knowledge of what was to transpire in terms of quantity of delivery and sources and how to transport was insignificant. He was not in the loop." Appellant's Opening Brief at 14. Furthermore, appellant claims that United States v. Christman, 894 F.2d 339 (9th Cir.1990) supports his contention. In Christman, we upheld a district court's determination that the defendant was not entitled to consideration as a minimal participant since the record demonstrated that he utilized the telephone to negotiate the price and quantity of drugs. Id. at 341. Christman does not support Prieto-Martinez's contention.
 
 
 89
 A review of the record supports the district court's finding that Prieto-Martinez is not entitled to any downward adjustment. Jose Garcia told Special Agent Sellers to wait in the lobby at the hotel on June 17, 1992, where he would be met by someone he knew. In the lobby, Sellers met with Prieto-Martinez, who took Sellers up to room 150. Prieto-Martinez assured Sellers that the individuals he would meet were dependable businessmen who would have the cocaine. After Alcarez-Ochoa arrived in the hotel room, discussions took place in Spanish between Alcarez-Ochoa, Garibaldi-Gomez, and Prieto-Martinez regarding the status of the 500 kilogram deal. When Special Agent Sellers and Alcarez-Ochoa were involved in a dispute concerning whether the drugs would be shown prior to Sellers showing his money, Prieto-Martinez acted as a mediator, calming both parties. On June 18, Prieto-Martinez, along with Jose Garcia and Garibaldi-Gomez, accompanied Sellers to the residence to consummate the deal.
 
 
 90
 2. Offense Level Calculation Properly Based Upon Negotiated Quantity of 500 Kilograms
 
 
 91
 See discussion under Section IV Part C2, titled "Offense Level Calculation Properly Based Upon Negotiated Quantity of 500 Kilograms" for an analysis of this issue.
 
 E. Alcarez-Ochoa
 
 92
 Alcarez-Ochoa contends that the proper offense level should be calculated on the basis of 40 kilograms. We reject Alcarez-Ochoa's argument and conclude that the district court properly determined the appropriate base offense level. See discussion under Section IV Part C2, titled "Offense Level Calculation Properly Based Upon Negotiated Quantity of 500 Kilograms" for an analysis of this issue.
 
 
 93
 V. SEARCH AND SEIZURE OF COCAINE CONTAINED IN THE TRUNK OF
 
 AGUILAR-PACHECO'S AUTOMOBILE
 
 94
 Aguilar-Pacheco contends that the district court erred by denying his motion to suppress the 60 kilograms of cocaine contained in the trunk of the Thunderbird he drove to the residence on June 18, 1991. Aguilar-Pacheco argues that the agents did not have probable cause to search the car because the tip provided by Jose Garcia was not reliable, and therefore, the agents should have obtained a warrant to search the car when they applied for a warrant to search the residence. Additionally, Aguilar-Pacheco argues that he did not voluntarily consent to a search of the trunk. We review the district court's determination of probable cause de novo. United States v. Dunn, 946 F.2d 615, 619 (9th Cir.), cert. denied, 112 S.Ct. 401 (1991).
 
 
 95
 A. The District Court Properly Determined that the Tip Provided by Jose Garcia Established Probable Cause Based on a Totality of the Circumstances
 
 
 96
 The Fourth Amendment prohibits "unreasonable searches and seizures." U.S. Const. amend. IV. The determination of probable cause based upon an informant's tip is governed by Illinois v. Gates, 462 U.S. 213 (1983), and Draper v. United States, 358 U.S. 307 (1959). In Gates, the Supreme Court applied a "totality of the circumstances" test to decide the weight to be given to an anonymous informant's tip. Gates, 462 U.S. at 238. The Court found probable cause based upon independent police corroboration of an otherwise deficient tip which predicted the defendant's unusual travel plans and modus operandi of the criminal activity. Id. at 244-46. Similarly, in Draper, the Court found probable cause based upon police corroboration of a tip which indicated when Draper would arrive on a train from Chicago, described what he would be wearing, and indicated that he would be carrying heroin. Draper, 358 U.S. at 309-10, 312.
 
 
 97
 Jose Garcia told Special Agent Rhinegans that a white or light colored Ford Thunderbird that he had seen previously that day containing cocaine in the trunk would be returning to the residence[8] driven by a Hispanic male with the remainder of the cocaine delivery. Special Agent Rhinegans relayed this tip by radio to Special Agent Carver, who was driving back from the hotel to the residence. Special Agent Carver parked his car several houses away from the residence. From this vantage point, he was able to corroborate Jose Garcia's tip. Carver testified that "I saw a white Ford Thunderbird pass in front of me down the street towards the Wagon Wheel address.... [The driver] was a Hispanic male.... It started slowing just prior to the Wagon Wheel address and slowed up as it was getting towards the driveway." RT May 18, 1992 at 43-44.
 
 
 98
 Aguilar-Pacheco contends that there was insufficient corroboration to establish probable cause because the police did not actually see the cocaine before the arrest. As this court explained in United States v. Sutton, 794 F.2d 1415 (9th Cir.1986), "[t]he fact that [the police] did not actually observe any criminal activity is irrelevant as the facts are measured against an objective reasonable man standard, not the subjective impressions of the particular officer." Id. at 1427 (internal quotation and citation omitted). Aguilar-Pacheco further contends that he legally proceeded down the street and did not attempt to turn the vehicle into the driveway or turn on his directional signal. Aguilar-Pacheco maintains that such innocent conduct is not sufficiently probative of criminal activity. "Taken alone he may be correct. But when viewed in light of the tips and other circumstances noted above, this same activity appears highly suspicious. It is not uncommon for seemingly innocent conduct to provide the basis for probable cause." United States v. Rodriguez, 869 F.2d 479, 483 (9th Cir.1989).
 
 
 99
 Finally, Aguilar-Pacheco argues that Jose Garcia was not a reliable informant since he had been inaccurate and lied to the police in the past. This court has held that accurate predictions of future activity indicates a special familiarity with the suspect's affairs. See Hopkins v. City of Sierra Vista, 931 F.2d 524, 528-29 (9th Cir.1991) (warrantless search of apartment after officer received anonymous tip about domestic violence and upon arrival heard loud voices and other noises upheld). Therefore, while Jose Garcia's past reliability may have been questionable, under the totality of the circumstances, there was sufficient corroboration of his tip to establish probable cause.
 
 
 100
 This determination is particularly true in this matter because the police received a tip about Aguilar-Pacheco after they arrested Jose Garcia. Unlike the circumstances in Draper and Gates, the tip that led to Aguilar-Pacheco's arrest was not provided by an anonymous informer. Rather, it was provided by a co-conspirator who was under arrest and had first hand knowledge of events which were about to occur in furtherance of the conspiracy. These facts substantially enhance Jose Garcia's credibility.
 
 
 101
 B. The District Court Properly Determined that the Automobile Exception to the Fourth Amendment Applied, Rendering the Search of the Trunk Reasonable
 
 
 102
 The automobile exception justifies a warrantless search of an automobile due to its inherent mobility and the diminished expectation of privacy in a vehicle which is licensed to operate on public streets. California v. Carney, 471 U.S. 386, 392-93 (1985). "If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." United States v. Ross, 456 U.S. 798, 825 (1982).
 
 
 103
 Aguilar-Pacheco argues that because he was arrested before the search, the agents should have been required to obtain a warrant since he was no longer able to obtain access to the car and drive away. Since the agents obtained a warrant later that evening to search the residence, Aguilar-Pacheco contends that the agents should have immobilized the vehicle and suspended the search until they received a warrant to search the car. Aguilar-Pacheco's contention is contrary to established law. See United States v. Johns, 469 U.S. 478, 484 (1985) (there is no requirement that a warrantless search of a vehicle occur contemporaneously with its seizure). Once the agents had probable cause to believe the trunk contained cocaine, the automobile exception justified the search of the trunk and the seizure of cocaine contained inside.[9]
 
 VI. JOSE GARCIA'S PLEA BARGAIN
 
 104
 Jose Garcia contends that the Government violated the terms of his plea bargain by failing to make a motion for a downward departure and inform the court of the nature and extent of his cooperation. Jose Garcia further contends that the plea agreement was unconscionable. We review the district court's construction of a plea agreement for clear error. United States v. Fernandez, 960 F.2d 771, 772 (9th Cir.1991) (per curiam). Factual findings regarding the terms of a plea agreement are also reviewed for clear error. United States v. Sharp, 941 F.2d 811, 816 (9th Cir.1991), superseded in part on other grounds, 18 U.S.C. Sec. 3363(a)(2) (Supp.1991).
 
 
 105
 A. The Government Was Not Required to Make a Section 5K1.1 Downward Departure Motion
 
 
 106
 On April 16, 1992, Jose Garcia entered a plea of guilty pursuant to the terms of a plea agreement with the Government. Prior to accepting the plea, the district court engaged in a lengthy dialogue with Jose Garcia to ensure that he read and understood the terms and consequences of the agreement and had consulted with his lawyer. The court found that Jose Garcia was competent to enter a plea knowingly and voluntarily, and that he understood the nature of the charges and the consequences of entering a guilty plea.
 
 
 107
 Jose Garcia entered a guilty plea to both counts of the indictment. In exchange for his cooperation, the Government agreed to make a motion for a downward departure at sentencing pursuant to section 5K1.1. Section 3(d) of the plea agreement specifically conditioned the Government's obligation to recommend a downward departure upon its evaluation of Jose Garcia's testimony as to the following factors:
 
 
 108
 91) usefulness, (2) truthfulness and completeness, (3) significance to this investigation and other investigations, (4) nature and extent, (5) the potential danger to the defendant and his family posed by his cooperation, and (6) timeliness of defendant's offer to cooperate. The United States will also bring the nature and extent of defendant's cooperation to the attention of the court ... at sentencing or any other appropriate time.
 
 Section 3(f) indicated that:
 
 109
 [i]f the defendant fails to comply with any obligation or promise pursuant to this agreement, the United States (1) may, in its sole discretion, declare any provision of this agreement null and void in accordance with paragraph (g) below.
 
 Section 3(g) provided that:
 
 110
 [i]f there is a dispute regarding the obligation of the parties under this agreement, the United States District Court shall determine whether the United States or the defendant has failed to comply with this agreement including whether the defendant has been truthful.
 
 
 111
 On July 8, 1992, the Government filed a Sentencing Memorandum indicating that Jose Garcia violated the terms of the plea agreement since he was neither truthful nor complete in explaining his conduct or that of his co-conspirators. Accordingly, the Government refused to make a downward departure motion at sentencing. At the sentencing hearing, the Government called Special Agent Sellers as a witness to support its position that Jose Garcia breached the plea agreement. Special Agent Sellers testified that he was present during the Government's debriefings of Jose Garcia. Jose Garcia incorrectly stated the date of his initial contact with his co-defendants, admitted that he had not been truthful about this fact, and minimized the involvement of co-defendants Peimbert-Hernandez and Rubio-Garcia. The defense did not introduce any evidence to demonstrate that Jose Garcia upheld the agreement. The court found that Jose Garcia failed to fulfill his promise to cooperate, and therefore the Government was not obligated to make a section 5K1.1 motion.
 
 
 112
 We reject Jose Garcia's argument that the Government was required to make a section 5K1.1 motion. The agreement set forth specific conditions which Jose Garcia was required to satisfy in order to obtain the negotiated benefits. The Government determined that Jose Garcia was not a reliable witness based upon his debriefing testimony, and the district court found that Jose Garcia had not cooperated and failed to provide substantial assistance. The district court's findings are not clearly erroneous. Jose Garcia did not honor the terms of the plea agreement and suffered the consequences.
 
 
 113
 B. Government's Obligation to Inform the Court of the Nature and Extent of Jose Garcia's Cooperation
 
 
 114
 A review of the record indicates that Jose Garcia did not raise before the district court the issue that the Government failed to inform the court of the nature and extent of his cooperation in accordance with Section 3(d) of the plea agreement. Pursuant to United States v. Flores-Payon, 942 F.2d 556, 560 (9th Cir.1991), we decline to address the merits of Jose Garcia's claim.
 
 
 115
 In Flores-Payon, the defendant argued on appeal that both the district court and the Government violated the terms of a plea agreement. Id. at 558. Neither of these arguments were presented to the district court. We explained that a claim regarding the breach of a plea agreement is fact-specific and is "precisely the type of claim that a district court is best situated to resolve." Id. at 560. While we noted that there are exceptions to this rule, these exceptions are generally inapplicable when an appellant argues for the first time on appeal that a plea agreement was breached. Id. at 559-60. Since Jose Garcia has failed to establish that any of the exceptions apply in this matter, we decline to address his claim.
 
 C. Unconscionability of Plea Agreement
 
 116
 Similarly, we decline to address Jose Garcia's claim that the plea agreement was unconscionable because it was not raised before the district court. See United States v. Flores-Payon, 942 F.2d 556, 560 (9th Cir.1991).
 
 
 117
 VII. ADMISSION OF EVIDENCE REGARDING MAY 30, 1991, DRUG
 
 
 118
 NEGOTIATIONS AGAINST PRIETO-MARTINEZ AS A PRIOR
 
 BAD ACT PURSUANT TO RULE 404(b) OF THE
 FEDERAL RULES OF EVIDENCE
 
 119
 Prieto-Martinez contends that the district court erred by permitting Special Agent Sellers to testify regarding the negotiations pertaining to the failed drug deal which occurred on May 30, 1991. We review the admission of other crimes evidence pursuant to Federal Rule of Evidence 404(b) for an abuse of discretion. United States v. Khan, 993 F.2d 1368, 1376 (9th Cir.1993).
 
 
 120
 During his testimony, Prieto-Martinez denied that: (1) he participated in the negotiations for the sale of 500 kilograms of cocaine; (2) he had any knowledge that there would be 100 kilograms of cocaine available on June 19; (3) he had any knowledge that there would be cocaine at the residence; (4) he was present in room 150 of the hotel with Alcarez-Ochoa on June 17; (5) he took Special Agent Sellers to room 150 of the hotel on June 17; and (6) he was notified by Jose Garcia to either find or talk to Alcarez-Ochoa on the morning of June 19. In light of Prieto-Martinez's testimony, the Government argues that introduction of evidence concerning the May 30, 1991, drug negotiations is relevant prior act evidence under Federal Rule of Evidence 404(b) to establish Prieto-Martinez's knowledge and intent to enter into the conspiracy. We agree.
 
 
 121
 Under the law of this circuit, the Government is permitted to introduce evidence of prior acts under Rule 404(b) if the evidence is probative of a material element in the case. United States v. Ramirez-Jiminez, 967 F.2d 1321, 1325 (9th Cir.1992). Prior act evidence may " 'explain the nature of the relationship' between co-conspirators while placing 'their transaction in context for the jury,' thereby 'show[ing] the background and development of the conspiracy.' " United States v. Jones, 982 F.2d 380, 382-83 (9th Cir.1992) (quoting United States v. McKoy, 771 F.2d 1207, 1214 (9th Cir.1985)). This court has developed a four part test to analyze evidence admitted pursuant to Rule 404(b): (1) There must be proof that the defendant committed the prior bad act based on sufficient evidence; (2) the crimes or acts must not be too remote in time; (3) the prior criminal conduct must be similar to the acts with which defendant is charged; and (4) the evidence must prove an essential element of the charged offense. United States v. Miller, 874 F.2d 1255, 1268 (9th Cir.1989).
 
 
 122
 A review of the record establishes that the Government is able to satisfy each of these requirements. First, the Government introduced sufficient evidence of the prior act through the testimony of Special Agent Sellers. Second, the prior act occurred two weeks before the beginning of the conspiracy.[10] See United States v. Ono, 918 F.2d 1462, 1465 (9th Cir.1990) (prior act occurring six years earlier is not too remote in time). Third, the prior act involved negotiations for delivery of cocaine, which is the subject matter of this prosecution. See Id. (prior act involving heroin distribution is similar to conspiracy to manufacture heroin). Fourth, the issues of intent and knowledge are elements of the offenses for which Prieto-Martinez was indicted. See Jones, 982 F.2d at 382.
 
 
 123
 Under Federal Rule of Evidence 403, relevant evidence may be excluded, however, if its probative value is substantially outweighed by the danger of unfair prejudice. The record establishes that the district court carefully analyzed the impact of the prior act evidence and gave the jury a limiting instruction as to its significance. A limiting instruction regarding the introduction of prior act evidence may negate its improper effect on a jury's deliberations. See United States v. Khan, 993 F.2d 1368, 1377-78 (9th Cir.1993) (Government's introduction of evidence regarding defendant's prior drug trip was not unfairly prejudicial when accompanied by limiting instruction). Therefore, the district court did not abuse its discretion by permitting the Government to introduce evidence of the May 30 negotiations.
 
 
 124
 VIII. GOVERNMENT'S CROSS-EXAMINATION OF PRIETO-MARTINEZ
 
 
 125
 REGARDING HIS INVOLVEMENT IN THE MAY 30, 1991,
 
 DRUG NEGOTIATIONS
 
 126
 Prieto-Martinez contends that the district court erred by permitting the Government to cross-examine him regarding the May 30, 1991 drug negotiations because this issue was not raised during direct examination. We review the district court's ruling on the scope of cross-examination for an abuse of discretion. See United States v. Dischner, 974 F.2d 1502, 1514 n. 12 (9th Cir.1992), cert. denied, 113 S.Ct. 1290 (1993).
 
 
 127
 Rule 611(b) of the Federal Rules of Evidence states that "[c]ross-examination should be limited to the subject matter of the direct examination and matters affecting the credibility of the witness. The court may, in the exercise of discretion, permit inquiry into additional matters as if on direct examination." Fed.R.Evid. 611(b). A district court "may permit cross-examination as to all matters reasonably related to the issues ... put in dispute by [a witness'] testimony on direct." United States v. Arias-Villaneuva, 998 F.2d 1491, 1508 (9th Cir.) (internal quotation and citation omitted), cert. denied, --- U.S. ----, 414 S.Ct. 573, 126 L.Ed.2d 472 (U.S. Nov. 29, 1993).
 
 
 128
 On direct examination, the only questions defense counsel asked Prieto-Martinez regarding Jose Garcia concerned the length of their relationship. On cross-examination, the district court permitted the Government to inquire as to Prieto-Martinez's involvement with Jose Garcia on May 30 along with the circumstances of his introduction to Special Agent Sellers.
 
 
 129
 The length of Prieto-Martinez's relationship with Jose Garcia and his involvement with Jose Garcia on May 30 concern different subjects. However, we recently determined that Federal Rule of Evidence 611(b) should be broadly interpreted. In Arias-Villaneuva, the defendant testified on direct examination that he was tortured by the Mexican Federal Police. Id. at 1508. The district court permitted the Government to inquire as to the defendant's relationship and drug dealings with a co-defendant, his drug dealing activities in Mexico, his assets located in the United States, and his knowledge of the sale, manufacture, or distribution of heroin. Id. We rejected appellant's argument that the Government's cross-examination exceeded the scope of direct, holding that the subjects which were covered during cross-examination were reasonably related to his testimony on direct. Id.
 
 
 130
 In this matter, the Government argued that the May 30 drug negotiations were within the scope of direct because they related to Prieto-Martinez's credibility and his relationship with Jose Garcia. Pursuant to Arias-Villaneuva and Rule 611(b), this connection is sufficient to conclude that the district court did not abuse its discretion.
 
 
 131
 AFFIRMED.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Circuit Rule 36-3
 
 
 [1]
 In United States v. Collins, 764 F.2d 647 (9th Cir.1985) we held that possession of almost eight pounds of cocaine constituted a quantity sufficient to infer knowing possession. Id. at 652. In this matter, the car being driven by Aguilar-Pacheco contained 60 kilograms of cocaine, which converts to approximately 132 pounds
 
 
 [2]
 Prieto-Martinez and Aguilar-Pacheco argue that the district court erred in not entering a judgment of acquittal under Federal Rule of Criminal Procedure 29. We have rejected Prieto-Martinez's and Aguilar-Pcheco's contentions in Section II of this memorandum disposition. Because we hold that there was sufficient evidence to sustain their convictions for conspiracy and possession of cocaine, Prieto-Martinez and Aguilar-Pacheco did not suffer from a prejudicial "spillover." Rubio-Garcia does not contend on appeal that he is entitled to a judgment of acquittal, and the record contains sufficient evidence to sustain his convictions. Thus, he is similarly unable to demonstrate that he suffered a prejudicial "spillover."
 
 
 [3]
 This is in reference to Kastigar v. United States, 406 U.S. 441 (1972). The agreements between Garibaldi-Gomez and the Government specifically permit the Government to make derivative use of any statements made by Garibaldi-Gomez, obviating the need to hold a subsequent Kastigar hearing
 
 
 [4]
 This rule does not generally apply if
 (1) there are exceptional circumstances why the issue was not raised in the trial court,
 (2) the new issue arises while the appeal is pending because of a change in the law, or (3) the issue presented is purely one of law and the opposing party will suffer no prejudice as a result of the failure to raise the issue in the trial court.
 Flores-Payon, 942 F.2d at 558 (internal quotation and citation omitted). Appellant argues that the first exception applies because his lawyer abandoned him at sentencing, which is a critical stage in the trial process and thus an exceptional circumstance. We reject appellant's claim because his lawyer did not render ineffective assistance of counsel at sentencing.
 
 
 [5]
 Garibaldi-Gomez cites United States v. Cronic, 466 U.S. 648 (1984) and United States v. Swanson, 943 F.2d 1070 (9th Cir.1991) for the proposition that the prejudice prong of the Strickland test is inapplicable since defense counsel abandoned his role as an advocate. In Cronic, the trial court appointed a young lawyer to represent the defendant and permitted him 25 days to prepare a case which required over four-and-a-half years for the Government to investigate. Cronic, 466 U.S. at 649. Furthermore, counsel failed to present a defense. Id. at 651. In Swanson, the defendant's lawyer told the jury during closing argument that there was no reasonable doubt as to the only contested factual issues in the case. Swanson, 943 F.2d at 1074. Additionally, in Swanson we stated that a defendant would have to establish prejudice "(1) in cases where the record reflects that an attorney's errors or omissions occurred during an inept attempt to present a defense, or (2) that he or she engaged in an unsuccessful tactical maneuver that was intended to assist the defendant in obtaining a favorable ruling." Id. at 1073. Since defense counsel made a tactical decision concerning his argument for a departure, Garibaldi-Gomez is required to establish prejudice to prevail on his ineffectiveness claim
 6 U.S.S.G. Sec. 3B1.2 states as follows:
 Based on the defendant's role in the offense, decrease the offense level as follows:
 (a) If the defendant was a minimal participant in any criminal activity, decrease by 4 levels.
 (b) If the defendant was a minor participant in any criminal activity, decrease by 2 levels.
 In cases falling between (a) and (b), decrease by 3 levels.
 
 
 [7]
 Garibaldi-Gomez told Sellers that he had access to multiple tons of cocaine and could deliver 500 kilograms every three or four days. Rubio-Garcia told Sellers that it would be "no problemo" to deliver 500 kilograms of cocaine. Peimbert-Hernandez told Sellers that he could have 500 kilograms every two days if he wanted
 
 
 [8]
 Jose Garcia provided Special Agent Rhinegans with the specific address where the Ford Thunderbird would be returning, which included the street name and exact house number. The parties to this appeal know the street address. We omit this information because of the possibility that the residence is presently occupied by innocent individuals who have nothing to do with criminal activity
 
 
 [9]
 Because we hold that the automobile exception permitted the agents to search the trunk of the car and seize the cocaine contained inside, we need not decide whether Aguilar-Pacheco voluntarily consented to a search of the trunk
 
 
 [10]
 The Government indicated to the district court that while the indictment charges that the conspiracy began on or about May 27, 1991, in actuality, the conspiracy probably began on June 13 or 14. See Section III, Part B, titled "Starting Date of Conspiracy."